(A. R. D. 85)

UNITED STATES v. BAAR & BEARDS, INC.

Entry Nos. 897192; 901281.

## Third Division, Appellate Term

(Decided May 14, 1958)

*George Cochran Doub*, Assistant Attorney General (*Daniel I. Auster*, trial attorney), for the appellant.

*Sharretts, Paley & Carter* (*Howard Clare Carter* and *Joseph F. Donohue* of counsel) for the appellee.

Before JOHNSON, DONLON, and RICHARDSON, Judges; DONLON, J., dissenting

RICHARDSON, Judge: These are two appeals from a judgment of a single judge sitting in reappraisement in the second division sustaining an appeal from the appraiser's decision determining the dutiable export value of the merchandise here involved. *Baar & Beards, Inc.* v. *United States*, 37 Cust. Ct. 552, Reap. Dec. 8696.

The merchandise consists of certain habutae solid-colored scarves, exported from Japan on April 16 and 25, 1953, and entered at New York on May 25 and June 1, 1953, respectively.

These appeals raise the question of whether the merchandise involved was "freely offered for sale to all purchasers in the principal markets of the country from which exported . . . in the ordinary course of trade, for exportation to the United States," within the meaning of 19 U. S. C., section 1402 (d) (section 402 (d) of the Tariff Act of 1930), at the prices contended for by the importer ($2.85 per dozen, f. o. b. Yokohama, in reappraisement No. 234862–A and $2.87 per dozen, f. o. b. Yokohama, in reappraisement No. 234863–A) or at the prices contended for by the Government ($2.99 per dozen, f. o. b. Yokohama, in both reappraisement cases).

The respective parties, through their attorneys, have agreed, in effect, that merchandise such as or similar to that here involved was not sold or offered for sale for home consumption in Japan, within the provisions of section 402 of the Tariff Act of 1930, and that the proper basis for finding a value for the merchandise is export value. No

question is raised in this case regarding the principal market, usual wholesale quantity, or inland freight charges.

At the trial of these two appeals, counsel for the plaintiff offered and there was received in evidence as exhibit 1 an affidavit of Tatsuo Nishiwaki, manager of Z. Horikoshi & Co., Ltd., and the plaintiff rested. The defendant offered in evidence seven reports, which were admitted and marked exhibits A through G. Exhibit A is a report addressed to the Commissioner of Customs, Washington, D. C., and is signed by Lester D. Johnson, appraiser of merchandise. Exhibit C is a report addressed to Department of State and is signed by Laurence W. Taylor, American consul general. The other reports bear the heading: FOREIGN SERVICE OF THE UNITED STATES OF AMERICA, OPERATIONS MEMORANDUM, and are addressed to Department of State. These reports do not bear the signature of any one, but the party making these reports has been properly identified as "officers of the Government" by a certificate signed by John Foster Dulles, Secretary of State. These reports come within the class of documents made admissible in evidence by 28 U. S. C., section 2633, which provides that:

In finding the value of merchandise, in reappraisement proceedings before a single judge of the Customs Court, affidavits and depositions of persons whose attendance cannot reasonably be had, price lists, and catalogues, reports or depositions of consuls, customs agents, collectors, appraisers, assistant appraisers, examiners, and other officers of the Government may be admitted in evidence.

All of the evidence submitted is documentary and consists of the official papers and the exhibits listed above.

In an affidavit in exhibit 1, dated September 30, 1955, Tatsuo Nishiwaki, the manager of Z. Horikoshi & Co., Ltd., Yokohama, stated that he was thoroughly familiar with the prices at which silk scarves had been freely offered for sale and sold for exportation to the United States in Tokyo, Yokohama, and Kobe, which, according to the affidavit, are the principal markets of Japan for the sale of silk scarves. He stated further that:

3. On or about July, 1951 the Ministry of International Trade and Industry, commonly known as "MITI", an agency of the Japanese government having jurisdiction over the issuance of export licenses for the exportation of silk scarves from Japan, began a survey of the Japanese scarf industry for the announced purpose of discovering ways and means for the economic stabilization of the Japanese silk scarf industry. The Japanese Scarf Manufacturers Association and MITI officials held a great many meetings and every manufacturer submitted cost of production statements for each of the styles of scarves that it manufactured. On or about September 1951 MITI began to refuse to issue export licenses for shipments of silk scarves that had been sold at a price lower than MITI considered to be the median cost of production of that item in the industry. There was never any publication of the prices that MITI considered to be the lowest prices at which the product should be sold, but the approximate amount of the price (which has become known as the "check price") can be and was determined

by submitting a series of invoices covering the same article in connection with the application for an export license. For instance, if an export license application covering silk scarves of a specific size, quality and print is denied when the selling price was shown to be $2.75 per dozen or $2.78 per dozen, but is granted when the price was $2.80 per dozen, I know that the "check price" is either $2.79 or $2.80, but *the "check price" has no relationship whatsoever to the price at which the merchandise was freely offered for sale and was sold.* During the period from September 1951 to date, actual market prices have often been lower than "check prices". [Italics added.]

4. On or about April 3, 1953 I sold 101½ dozen 4 momme Habutae Solid colored scarves with handrolled hems, 33¼″ by 35¼″, Grade A to Baar & Beards, Inc. of New York City at $3.10 per dozen, F. O. B. Yokohama. My company exported these scarves to the United States in a case marked H. E. 2063 laden aboard the S. S. Surabaya Maru which sailed from Japan on April 16, 1953. *On April 16, 1953 silk scarves identical with those shipped were freely offered for sale and were sold to all persons in Tokyo, Yokohama and Kobe, the principal markets of Japan for the sale of such merchandise for exportation to the United States at $2.85 per dozen F. O. B. Yokohama,* and the price did not vary by reason of the quantity purchased. Said price of $2.85 per dozen included the cost of all containers and coverings of whatever nature, and all other costs, charges and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States. To the best of my knowledge and belief, the "check price" on April 16, 1953 for these scarves was $2.99 per dozen, F. O. B. Yokohama, but all offers of sale and sales of identical merchandise and of merchandise substantially similar in quality and weight of material, quality of workmanship, dyed in the same or similar colors and produced or manufactured at about the same cost of production on that date (April 16, 1953) were sales or offers for exportation to the United States at $2.85 per dozen, F. O. B. Yokohama. . . . [Italics added.]

Appellant's exhibit B contains the following statement, regarding a sale of scarves by K. Oyama & Co. of Yokohama:

It can be presumably considered that the *check prices exist only to the extent of forcing the exporters to invoice their merchandise at MITI's check prices in order to obtain an export license for the merchandise.* . . . [Italics added.]

Appellant's exhibit C contains the following statement, with respect to the sale of silk scarves by Mutoh Shoten of Yokohama:

. . . *In order to obtain an export license from MITI the seller conformed to the "check price" level.* . . . [Italics added.]

Appellant's exhibit D contains the following statement:

. . . *Check prices exist only to the extent of forcing the exporters to invoice their merchandise at MITI levels in order to obtain export licenses for shipment of the merchandise.* [Italics added.]

Appellant's exhibit F contains this statement:

· . . . *The seller conformed to the MITI check price in order to obtain an export license.* . . . [Italics added.]

Appellant's exhibit G contains this statement:

. . . *MITI's control . . . existed only to the extent of forcing the exporters to invoice their merchandise at MITI check prices in order to obtain export licenses.* [Italics added.]

The Japanese Ministry of International Trade and Industry shall hereinafter in this opinion be referred to as MITI.

MITI was aware, however, of the practice of arranging credits during the period in which the sales in question were consummated, and, despite the widespread evasion of its orders, as reflected in the above-mentioned exhibits, took no steps to enforce its unpublished minimum price, even though the Foreign Exchange and Foreign Trade Control Law provided methods for doing so. Article 53 provided that the Minister of International Trade and Industry "may prohibit any person who, in connection with the export or import of goods, has violated the provisions of this Law, ordinances or measures based thereon, from engaging in export or import transactions for a period not exceeding one year." Article 68 of the said law provided for spot inspections of the books, documents, and other articles of places of business or offices of the foreign exchange banks and money changers and interrogation of the persons concerned. Article 72 provided for penal servitude up to 6 months or a fine not exceeding (50,000) yen for persons who refused, obstructed, or evaded the inspection under article 68, or failed to respond or made false response to the interrogation under article 68.

Counsel for the appellant conceded that, though the above sanctions were available, there was no enforcement of the law during the period under consideration (R. 6, oral argument).

There is a question as to whether a price control law, even when adhered to, purports to represent actual value. It is designed to stabilize a market or channels of distribution. Minimum prices are established to provide a floor below which certain merchandise is not to be sold when there is an over-abundant supply. Maximum prices are established to provide a ceiling above which certain merchandise is not to be sold when there is a short supply. The Japanese Administrative Regulation invited evasion. The only sanction available was on the seller—he could be refused an export license, if his application for a license did not show a sales price at or above the unpublished check price; or his export privileges could be suspended for a period of not to exceed 1 year, if it were ascertained that he had sold below the unpublished check price. There were no sanctions on the purchaser, if he paid below the floor price. Thus, the regulation was, in effect, only a floor on the amount the seller could charge. It did not provide a floor or limitation on what the purchaser could pay. Any price control law which places a floor or ceiling on the amount a seller can charge and provides for sanctions on him without, at the same time, placing a floor or ceiling on the amount the purchaser can pay and providing for sanctions on the purchaser is an open invitation to evasion.

It was conceded by counsel for plaintiff and the Government, and the evidence clearly establishes, that there was no enforcement of the regulation and not a single license was refused or suspended because the contract and actual sales price differed from the price stated in the exporter's application. In an atmosphere of almost universal evasion and no application of available sanctions, it is difficult to see how it can be said that the unpublished so-called check prices either stabilized the market or determined the value of silk scarves during the period involved. To say that the so-called check on MITI prices, which were not adhered to or enforced in the foreign country, should be used as a standard of export value in this case is tantamount to asking that we impose a penalty against nationals in this country which was not provided for in the foreign regulation.

The United States Customs Court is a court of law concerned with the value of merchandise under the tariff acts as written. It does not have equity powers. Supply and demand and the price at which merchandise actually flows in the traffic of the market place determine its value at a given time. An administrative regulation of a foreign country providing for an unpublished floor price which is not ordinarily adhered to in commercial transactions and is not enforced by the agency establishing it does not determine value. As laudable as it would be and as much as this court would like to see commercial transactions walk arm in arm through the market place with business ethics, it does not always happen. "Our tariff acts must be interpreted as written, and not so as to meet the exigencies of foreign trade or governments." *United States* v. *Graham & Zenger, Inc.*, 31 C. C. P. A. (Customs) 131, 135, C. A. D. 262.

In reaching the conclusion we do, we are not consenting to what appellant refers to as an illegal practice, but merely recognizing what the evidence overwhelmingly establishes was the method of doing business which was so pronounced as to be regarded as "ordinarily" and "freely" indulged in. Section 402 of the tariff act does not require that the price be in accordance with a foreign administrative regulation which is not adhered to and not enforced. No law required the purchaser to pay any price at, above, or below any particular level. If the bulk of the sales were being made at one price in fact, regardless of the subterfuge indulged in to make believe a price control law was being complied with, we think the prices in fact for such sales would represent the basis for determining value. A foreign Government mandate issued to sellers that a price should be a particular figure cannot void the price at which the merchandise is actually selling for openly on the market, when the Government mandate is widely "disregarded, overlooked, and run away with by the actual market." *E. J. Reynolds* v. *United States*, 39 Treas. Dec. 146, 147, T. D. 38645. 28 U. S. C., section 2633, provides:

The value found by the appraiser shall be presumed to be the value of the merchandise. The burden shall rest upon the party who challenges its correctness to prove otherwise.

Exhibit 1, the affidavit of the manager of Z. Horikoshi & Co., Ltd., was admitted in evidence under 28 U. S. C., section 2633, which also provides that:

In finding the value of merchandise, in reappraisement proceedings before a single judge of the Customs Court, affidavits and depositions of persons whose attendance cannot reasonably be had . . . may be admitted in evidence. . . .

The affidavit was made by a person experienced in the business of selling the merchandise involved in the principal markets of Japan and, as such, he was in a position to know the market conditions in Japan on April 16, 1953. His affidavit was sufficient to overcome the presumption of the correctness of the appraiser's findings and established that merchandise identical with that covered by reappraisement No. 234862–A was being freely offered and sold, in what was then the ordinary course of trade, to all purchasers in the principal markets in Japan for exportation to the United States at $2.85 per dozen, f. o. b. Yokohama, on April 16, 1953. The Government introduced no evidence to show that any sale was in fact freely made in what was then the ordinary course of trade at any price other than $2.85 per dozen, f. o. b. Yokohama, on April 16, 1953, and thus did not overcome the sworn statement of the manager of Z. Horikoshi & Co., Ltd. *United States* v. *Sabin*, 12 Ct. Cust. Appls. 520, T. D. 40731.

The affidavit of the manager of Z. Horikoshi & Co., Ltd., deals specifically with the merchandise covered in reappraisement No. 234862–A, which was exported from Japan on April 16, 1953. The ruling of the single judge sitting in reappraisement that the affidavit may well be considered as some evidence of value of the merchandise covered by reappraisement No. 234863–A, which was exported from Japan 9 days later, April 25, 1953, was error. The affiant did not expressly or impliedly indicate what the value of the merchandise was between April 16 and 25 or on April 25, 1953, and we cannot assume that a price of $2.85 for silk scarves on April 16, 1953, would be some evidence of a price of $2.87 for such scarves on April 25, 1953. The case of *R. Mohr & Sons et al.* v. *United States*, 16 Ct. Cust. Appls. 448, T. D. 43198, cited by the single judge, is distinguishable from this case, in that the affiant in the *Mohr* case, *supra*, stated that there was "no appreciable change in the value of the merchandise" *during the entire period involved*, and, in this case, the affiant, in exhibit 1, does not go beyond the value of the merchandise on April 16, 1953. The affiant did state as a general proposition that "the 'check price' has no relationship whatsoever to the price at which the merchandise was freely offered for sale and was sold." In view of the short period of 9 days between the two sales and the

consistent statement persisting through all of appellant's exhibits that there was widespread evidence of circumvention of MITI's regulation, it is proper to consider the statement from the affidavit just quoted as some evidence of the ineffectiveness of the check prices from April 16, 1953, through April 25, 1953.

The error of the single judge sitting in reappraisement is not a reversible error, however, since he reached the correct conclusion on the export value, and the conclusion is amply supported by the weight of the evidence, as established in appellant's exhibit A. Exhibit A contains this statement:

. . . : The merchandise covered by Consular Invoice Number 22466, certified at Tokyo, Japan, April 24, 1953, was ordered by BAAR and BEARDS, Inc., through their Tokyo representative on April 10, 1953, and is covered by K. Kachi & Company's contract No. 225, which was for 100 dozen 4 momme habutae silk scarves, style number 5100, solid color, hand rolled hems, at a unit price of $2.87 per dozen F. O. B. Yokohama. Payment for this shipment was made by means of Letter of Credit No. 60223 issued by the Bank of Manhattan Company in the sum of $305.98, which represents 101½ dozen scarves at $2.99 per dozen, totalling $303.48 plus $2.50 consular fee. $2.99 per dozen was the check price for this type of merchandise on the date of exportation concerned and the difference of 12 cents per dozen was paid in yen to the Tokyo office of BAAR and BEARDS, Inc., on December 17, 1953.

There is no evidence by the Government of any other price on the date of exportation, April 25, 1953.

The importer may be relieved of the burden of proof usually required to overcome the presumption of the correctness of the finding of value by the appraiser, when the Government submits documents, as here, which contain evidence in support of the importer's claim.

. . . If there be contained therein [the Government's evidence] competent evidence beneficial to the importer, we think [the] importer is entitled to have the same considered and weighed along with all the evidence in the case. [*Golding Bros. Co., Inc.* v. *United States*, 21 C. C. P. A. (Customs) 395, 400, T. D. 46926. See also *Florea & Co., Inc.* v. *United States*, 7 Cust. Ct. 581, Reap. Dec. 5489.]

Had the Government not elected to introduce evidence on its own behalf and moved to dismiss the appeal, with respect to reappraisement No. 234863–A, at the conclusion of importer's presentation of evidence, the situation would have been different.

We are of the opinion that there is some substantial evidence of record to support the appraisement by the single judge. We find as facts: (1) That appellee's exhibit 1, the affidavit of Tatsuo Nishiwaki, manager of Z. Horikoshi & Co., Ltd., was sufficient to overcome the presumption of the correctness of the finding of value by the appraiser in reappraisement No. 234862–A and establish the export value of the silk scarves in that case of $2.85 per dozen, f. o. b. Yokohama, on April 16, 1953; (2) that appellant's exhibit A, which contains a report of a statement made by Jerry Kondo, director of K. Kachi

& Co., Ltd., was sufficient to overcome the presumption of the correctness of the finding of value by the appraiser in reappraisement No. 234863–A and establish the export value of the silk scarves in that case of $2.87 per dozen, f. o. b. Yokohama, on April 25, 1953; (3) that the record does not contain evidence of any sale of silk scarves consummated at the MITI price of $2.99 per dozen, f. o. b. Yokohama, except where a rebate or refund was made to the purchaser for the difference between the MITI price and the contracted purchase price. Based upon the findings of facts in the record before this division and after weighing all' of the evidence, we find that the weight of the evidence supports the appraisement by the single judge and that the merchandise involved in this appeal was freely offered for sale to all purchasers in the principal markets of Japan, in the ordinary course of trade for exportation to the United States, within the meaning of 19 U. S. C., section 1402 (d) (section 402 (d) of the Tariff Act of 1930), at the export value of $2.85 per dozen in reappraisement No. 234862–A and $2.87 per dozen in reappraisement No. 234863–A.

The judgment of the trial court is affirmed. Judgment will be rendered accordingly.

### DISSENTING OPINION

Donlon, Judge: I do not agree that the record before us supports a finding that export value is the basis of appraisement of these Japanese silk scarves.

The specifications for a finding of export value are precise. Apart from other factors included within the statutory definition, which are not here in dispute, a finding of export value requires that there shall be a market, or price, at which such or similar merchandise is *freely offered to all purchasers for export* to the United States.

For reasons I shall state, it is my opinion that the restraints on exports imposed by the Japanese Government, effective at the times of these exportations, preclude our finding as fact that controlled merchandise, such as these scarves, could be or was then *freely offered to all purchasers for export* from Japan to the United States.

This merchandise was appraised at a purported export value of United States $2.99 per dozen scarves. That is the value for which appellant (defendant below) contends. Although this was the minimum price at which the exported scarves could be invoiced under the export control program, and it was the minimum price paid in dollars by American buyers of such scarves at the time of these exportations, it was not a freely offered price. It was the then-effective export control price, fixed by an authorized Japanese governmental agency.

The evidence adduced in support of the lower export value for which appellee (plaintiff below) contends, is principally the statement of a

Japanese agent, contained in an affidavit of record, that these scarves were freely offered for export to the United States at prices below the export control price. What are free offerings is an issue of fact, to be decided on all the evidence of record. This evidence, on which appellee chiefly relies, is evidence by affidavit. There was no opportunity for the court to observe the witness, or for appellant's counsel to cross-examine. While such evidence is admissible, it must be weighed with all other evidence.

The record as a whole makes it evident that prospective sellers for export, and prospective buyers also, knew that any offers at prices below whatever the Government control price might be, would not and could not eventuate in export transactions. As to the goods before us, the prices that were invoiced to the American importer in United States dollars, and the prices that were paid by the importer to the Japanese exporter in dollars, were not less than the United States dollar price fixed by the Japanese Government and effective at the times of these exportations.

It appears that there was a rebate or discount arrangement, outside the control program, by virtue of which appellee some time later received credit, within Japan, of an undisclosed sum in Japanese yen. Although the purchase price was in dollars, this was not a dollar rebate or a dollar discount. The record does not show exactly what yen sums were rebated. In a report of a Treasury agent, part of defendant's exhibit A, there is quoted a statement by one Jerry Kondo, director of K. Kachi & Co., Ltd., Tokyo, seller of the merchandise in reappraisement 234863–A, that this merchandise was certified for export on April 24, 1953 (having been ordered on April 10, 1953), that payment was at $2.99 per dozen, and that, on December 17, 1953, considerably later, "12 cents per dozen was paid in yen" to buyer's Tokyo office. Defendant's exhibit A, pages 2, 3.

Mr. Kondo also stated, as reported by the Treasury agent in the same exhibit, that "K. KACHI & Company did not make a practice of rebating and did so only when required to do so by the importers concerned in order to hold their business."

This attack on appellee's case is in addition to the preponderance of evidence before us that Government restraints on exports and Government control over export permits preclude a finding that there were free offers of this merchandise to all purchasers for export. Even if there were such offers, and I am of opinion there were not, the fact that sellers in Japan made yen rebates to some customers, including appellee, but did not grant such rebates to all purchasers, or as a general practice, takes the so-called net prices for which appellee contends (that is, invoice price, less rebates) out of consideration as freely offered prices to all purchasers for export. That a price must be one offered *to all purchasers*, is a basic requirement of the statutory

definition of export value. This proposition is fundamental and does not call for citation of authorities. On the weight of evidence before us, it appears that the net prices for which appellee contends were *not* prices offered to all purchasers.

Both the majority and the trial judge emphasize their view that the program of the Japanese Government, here involved, was a program of price control, and that this program was notably ineffective to accomplish the ascribed objective of price control.

I do not so read the record. The Government program we are considering was designed to achieve control over exports. Everything before us supports the view that the program was carried out in such a way as to be highly effective in accomplishing that objective.

The name of the so-called MITI agency of Government is revealing. It is the Ministry of International Trade and Industry. In December 1949, the Japanese cabinet issued an Export Control Order, under authority of the Foreign Exchange and Foreign Trade Control Law, No. 228 of December 1, 1949. It is that law and that cabinet order with which this litigation is concerned.

The purpose of the Foreign Exchange and Foreign Trade Control Law is stated in chapter I, article 1. The law was introduced in evidence as a part of defendant's exhibit A, in Japanese text, with an English translation, stipulated by counsel to be true and correct. The purpose of the law, in English translation, reads as follows:

> The purpose of this Law is to provide for the control of foreign exchange, foreign trade and other foreign transactions, necessary for the proper development of foreign trade and for the safeguarding of the balance of international payments and the stability of the currency, as well as the most economic and beneficial use of foreign currency funds, for the sake of the rehabilitation and the expansion of the national economy.

The law has to do with several categories of transactions, of which foreign trade is one. Chapter VI of the law is entitled "FOREIGN TRADE." It provides that export of goods from Japan shall be permitted with the minimum restrictions *consistent with the purpose of this law* (Article 47). As noted above, the purpose of the law is to develop international trade and safeguard the balance of international payments and the economic and beneficial use of foreign currency funds. It is common knowledge, of which a court should not be unaware, that at the close of World War II Japan desperately needed to promote its international trade. How successfully it has done so, at least as to trade with the United States, is also common knowledge.

Chapter VI of the law includes other provisions relative to foreign trade, of which pertinent provisions may be summarized as follows:

> Any one desiring to export goods from Japan may be required to obtain approval of the Minister of International Trade and Industry for those types of export goods provided for by Cabinet order, and the restrictions imposed shall be within

the limits of necessity for maintenance of international payment and sound development of international trade or national economy (Art. 48).

The Minister may require adequate certification that satisfactory payment is provided (Art. 49).

There are other provisions in chapter VI, including provisions for control of imports, that are not pertinent to this litigation.

Restrictions set under this law and the ordinances that were issued under the law appear to have adhered closely to the spirit of the law with respect to reasonable limits on the export of these scarves. I do not share the view of the majority that the Japanese Government was lax in the enforcement of its export control program. The price invoiced to, and actually paid by, the foreign buyer in United States currency for these goods had to be not less than the so-called "check" price for the merchandise at the time the export permit was issued. In any event, permit might be denied. Otherwise, there is no reason to suppose the Japanese Government had any interest, or reason for interest, in a side transaction with a favored buyer, made in yen and which did not adversely affect the dollar funds made available to the Japanese economy by the transaction.

Cases are cited in the briefs in which foreign price controls have been held not incompatible with a finding that foreign value existed. Here, we have no price controls, as such, nor is our problem that of foreign value.

Belgian syndicate controls over glassware have been held to be a merchandising practice that did not constitute the kind of trading contemplated by section 402 (c), and, hence, there was not a foreign value for the glassware. *United States* v. *Graham & Zenger, Inc.*, 31 C. C. P. A. (Customs) 131, C. A. D. 262. Our appeals court commented, as to the export value for which the importer contended: "The Government does not contend that, if foreign value is not the proper dutiable basis, the export value is not such basis." (At p. 133.) This is the only mention of export value in the well-considered opinion of Judge Jackson dealing, except for that sentence, with foreign value.

To the point, is the succinct attack on the argument that Government controls do not convert an otherwise free market into a restricted one. In the *Graham & Zenger, Inc.*, case, *supra*, at page 135, Judge Jackson's opinion says:

Appellant contends that restraints imposed by the sovereign on the interchange of goods because of war or abnormal world conditions do not convert an otherwise free market into a restricted one. To read this contention is to answer it. Wherever a restraint is imposed upon the use of purchased goods there can be no free market, regardless of whether such restraint has been imposed by the sovereign or a private association, cartel, or syndicate. The very essence of freedom is taken from a sale of goods accompanied by any restraint with respect to its resale, use or other disposition, regardless of the source of such restraint. Our tariff acts must be interpreted as written, and not so as to meet the exigencies of foreign trade or governments. If, as urged by appellant, the regulations by foreign

governments of the free flow of goods might render it impossible to find a foreign value, export value, or United States value for many if not all commodities, in our opinion the remedy lies with the Congress and not with the courts.

Here, the restraint imposed by the Japanese Government was over export. Export might be prohibited, or conditions might be attached by the Minister. No purchaser for export knew, at the time goods were offered to him, or indeed until application was made for leave to export the goods, whether or not he could use the goods for export or what price in dollars he would have to pay for the goods. This is such restraint with respect to use or disposition, as to preclude here a finding of export value.

The Minister of International Trade and Industry had authority to deny export, or to attach conditions to his approval of export, "when he deems it necessary for the maintenance of the balance of international payment and sound development of international trade or national economy." . Defendant's exhibit A, Export Trade Control Order (Cabinet Order No. 378, December 1, 1949). Appellee's exhibit 1, affidavit of Tatsuo Nishiwaki, manager of Z. Horikoshi & Co., Ltd., Yokohama, avers that the Minister did, on occasion, refuse export licenses for shipments of silk scarves. That is to say, sanctions were imposed, and the use or disposition of goods purchased for exportation was *pro tanto* restrained by the Japanese Government.

These export controls made it impossible for sellers freely to offer controlled goods for export to the United States at any price. There were no published "check" prices. Except as rumor got around, no one knew whether or not a sale for export could be consummated, or if so, at what price.

It is said that the Government export control program bogged down because effective sanctions were not imposed on purchasers. In my view, the sanctions imposed on purchasers for export were effective. They could hardly have been more so. There could be a peremptory "no" to the export of any particular lot of controlled goods, and there surely would be such refusal, unless the Minister was well satisfied that the Japanese economy realized foreign exchange in payment of the merchandise on the basis of an arbitrary price unrelated to any so-called offers made by sellers. These were sanctions which purchasers for export could not and did not escape.

The apparent concurrence of the parties that export value is the appropriate basis of appraisement of this merchandise does not deny to the court its duty to review the evidence. The basis of valuation of merchandise for tariff purposes is an issue of law, to be decided by the courts. Weighing all the facts of record, ours is the duty of deciding whether or not the claimed basis of appraisement is proper. The majority find export value. I do not.

The proofs adduced show, in my opinion, that export value is not the proper basis of appraisement of these scarves. Congress has pro-

vided other bases of appraisement, in those cases where it appears that there is neither a foreign value nor an export value of the merchandise. However, appellee (plaintiff below) has not claimed, nor has it proved, either United States selling price or cost of production as an alternative basis of valuation of this merchandise. That being so, the appraisement should be affirmed.

* * * Whether or not the appraised value is erroneous, it stands, unless appellant proves the right to another value. It is the presumptively correct value until proven otherwise. [*Nicholas Gal (Globe Shipping Co., Inc.)* v. *United States*, 38 Cust. Ct. 728, A. R. D. 72, appeal dismissed by United States Court of Customs and Patent Appeals, 45 C. C. P. A. (Customs) 129.]

Findings of fact and conclusion of law should be as follows:

Findings of fact.

1. On the evidence of record, such or similar merchandise was not freely offered in Japan for sale to domestic users, at or about the time of these exportations.

2. On the evidence of record, such or similar merchandise was not freely offered in the principal market in Japan, at or about the times of the instant exportations, to all purchasers for exportation to the United States, nor does the record show a price that was so offered to all purchasers.

3. The evidence of record does not show facts sufficient to establish a value for this merchandise based on United States selling price or cost of production.

Conclusion of law.

1. Appellee (plaintiff below) having failed to overcome the presumptively correct appraised values, the values of this merchandise are those returned by the appraiser.

The decision of the trial judge should be reversed, and judgment should be entered that the values of this merchandise are the values returned by the appraiser.