(A.R.D. 192)

AMERICAN BRAVO CO. *v.* UNITED STATES

Entry No. 12607, etc.

First Division, Appellate Term

(Decided June 22, 1965)

*Stein & Shostak* (*S. Richard Shostak* of counsel) for the appellant.
*John W. Douglas*, Assistant Attorney General (*Morris Braverman*, trial attorney), for the appellee.

NICHOLS, Judge: This is an application for review of a decision and judgment of Donlon, J., holding that plaintiff has failed to overcome the presumption of correctness attaching to the appraised values and sustaining those values. *American Bravo Co.* v. *United States*, 52 Cust. Ct. 417, Reap. Dec. 10665.

The merchandise is described on the invoices as brass plaques and was exported from England on various dates between September 17, 1955, and April 25, 1957. It was agreed by counsel that the articles were brass picture plaques, having hangers or hooks. According to the invoices, they were in different styles and compositions and had different item numbers.

The merchandise was appraised on the basis of foreign value, as defined in section 402(c), Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, at the invoice unit values, plus 25 percent, plus packing. Appellant claims that there is no foreign value for such or similar merchandise; that the proper basis of valuation is export value, as defined by section 402(d), Tariff Act of 1930; and that that value is represented by the invoice unit values, less 3¾ percent cash discount. It does not challenge the unit prices used by the appraiser to represent foreign value but challenges the existence of foreign value.

No testimony was adduced at the trial and the case was submitted on two affidavits offered by appellant and two foreign investigative reports offered by the Government. There were no samples and no catalogs, brochures, or advertising material. Because of appellant's view that the trial judge did not sufficiently consider all the evidence and counsel's admission on oral argument that the case may have been inadequately presented below, a detailed analysis of the record will be made. Appellant is, of course, entitled to the benefit that may be derived from any evidence introduced by the appellee. *Golding Bros. Co., Inc.* v. *United States*, 21 CCPA 395, T.D. 46926; *Wm. A. Foster & Co., Inc.* v. *United States*, 15 Cust. Ct. 459, Reap. Dec. 6233; *United States* v. *Baar & Beards, Inc.*, 40 Cust. Ct. 874, A.R.D. 85, reversed on other grounds 46 CCPA 92, C.A.D. 705. We do not construe the opinion below to state a refusal to follow this principle.

Plaintiff's collective exhibit 1 includes an affidavit of Kenneth B. Tolley, who had been export manager of The Greenland Manufacturing Company of Birmingham, the manufacturer of the instant merchandise, during the period from January 1, 1955, to January 31, 1961. Mr. Tolley stated that he was familiar with the merchandise sold by his firm and the conditions of sale thereof during that period, and that he was also familiar with market conditions affecting this line and the

prices of similar merchandise manufactured by competitors. He stated that "during the period 1st October, 1955 to 1st June, 1957, The Greenland Mfg. Co., did not sell or offer for sale any brass picture plaques in the home market in England"; that, to the best of his knowledge, no other manufacturer offered or sold brass picture plaques for home consumption during that period; that there was no market for such items because of a 60 percent luxury tax imposed in England on the ultimate purchaser of such merchandise. However, his firm and other manufacturers did sell brass sweet dishes in England during that period, which articles did not have any hooks or other provisions for hanging them on the wall. Such sweet dishes were considered utilitarian rather than decorative and were subject to a tax of only 30 percent.

During the period mentioned, according to Mr. Tolley's affidavit, brass picture plaques were freely offered and sold to all purchasers for exportation to the United States at list prices, less a cash discount of 3¾ percent. A "price list showing the prices of brass wall plaques offered and sold for export to the United States" was subsequently attached. Mr. Tolley stated that "said price list was an export price list and was not circulated in the home market in England."

The pricelist included in plaintiff's collective exhibit 1 is apparently a duplicated copy and is undated. It is headed "PRICE LIST No. ER 57" and gives information under the following headings: "English Prints," "Velveen Prints," "China Centres," "Size," "Type of border," and "Prices." It does not describe the merchandise as either plaques or sweet dishes. On the second page, it is stated:

Terms:  Home:  delivered in England, 3¾% prompt cash.
        Export:  delivered English port, 3¾% prompt settlement. Chests extra at 10/-each.

On the consular invoices, which are among the official papers and which were signed by Mr. Tolley, there appear the following questions and answers: "Is such or similar merchandise offered or sold in the home market for home consumption? Yes. If so, what taxes are applicable? 50% British Purchase tax." On some of the invoices, the tax rate is stated to be "60%." Although these invoices were not introduced into evidence, they may be considered for the purpose of impeaching credibility or showing inconsistency. *Dominick Butti* v. *United States*, 49 CCPA 1, C.A.D. 778.

Plaintiff's collective exhibit 2 consists of an affidavit of Ian King Macdonald, who became associated with The Greenland Manufacturing Company in 1958 and became export manager on February 1, 1961.

Defendant's collective exhibit A includes a copy of a letter from a partner of The Greenland Manufacturing Company, stating:

If the wholesale re-sale prices in this country are to be used as a basis for assessing duty on our products, then we feel that a 25% uplift on our home trade price list should be used, and not a 33⅓% uplift. The two wholesalers contacted by your department—Messrs. Dunwell & Mackay, and Messrs. Barnwell Hatcher & Co., mark up 33⅓% on *net cost*. But net cost to them is list less 5%. They are given this 5% discount in order to compete with other wholesalers who mark up 25% on list. The general mark-up, then, is 25%.

     *       *       *       *       *       *       *

Enclosed is a copy of our home price-list, and also a copy of our export price list. [Emphasis quoted.]

The first pricelist, dated September 21, 1955, and designated "Price List H55/6," includes sweet trays of various composition, some having the same item numbers as those on the invoices herein. The second pricelist contains the following in the upper right-hand corner:

*EXPORT PRICE LIST E55*
fob U.K. port, *cases extra.*
3¾% cash against sight draft.

It includes plaques of various composition, some having the same item numbers as are found on the first pricelist and on the invoices. Some of the prices are the same on both lists for merchandise having the same item numbers, and some are slightly higher on the second.

Defendant's collective exhibit A also includes a copy of a letter to the Customs Information Exchange from Deputy Commissioner Walter G. Roy, stating that all appraising officers were in agreement that foreign value did not exist at the level of the manufacturer or shipper, but that it could be established on the basis of sales by wholesalers; and that the general markup by wholesalers was 25 percent on the list prices.

Defendant's collective exhibit B is a report of Treasury Representative Wm. P. Hunton, giving information obtained on a visit to the factory offices on May 16, 1957. The report states, as to the export value, that the relationship between the manufacturer and the importers was that of seller and buyers; that the manufacturer and the buyers have no financial interest in each other; and that sale of the merchandise is not restricted to any purchaser or class of purchaser. A cash discount of 3¾ percent for payment within 7 days was freely offered to all purchasers.

As to foreign value, the report states:

Merchandise *identical* to that exported to the United States is not sold in the home market. Mr. Leeson informed me that British Purchase Tax on brass ornamental items of the type exported to the United States amounts to 60% ad valorem. This rate would apply to the types of items exported because they are manufactured with a "hanging ring" suitable for hanging the article as a wall ornament.

Items identical to those exported except for the omission of the hanging ring, are sold in the home market as "sweet Dishes" and bear the same stock numbers as the exported items.

The items without hanging rings are classified as utilitarian articles for British Purchase Tax at a rate of 15% ad valorem. [Emphasis quoted.]

Attached to the report are two exhibits, "A" and "B." Exhibit A is described in the report as an export and home market pricelist, the latter being the home market prices to retailers. It is headed "PRICE LIST No. ER57" and is dated April 29, 1957. The body of this pricelist is the same as the one attached to plaintiff's collective exhibit 1, the chief difference being that it is dated. Exhibit B is the manufacturer's home market pricelist to wholesalers. It is headed "PRICE LIST No. H56B" and includes prices for sweet dishes with some of the same item numbers as on the other pricelists. The prices are somewhat less than those on exhibit A.

In all, there are four pricelists in the record:

Price List H55/6, dated September 21, 1955, covering sweet trays, described as a home pricelist. (Defendant's collective exhibit A.)

Export Price List E55, covering plaques. (Defendant's collective exhibit A.)

Price List No. ER57, which does not designate the merchandise as either sweet dishes or plaques, and is a pricelist for export and for home market retailers. (Plaintiff's collective exhibit 1; defendant's collective exhibit B.)

Price List No. H56B, covering sweet dishes, for home market wholesalers. (Defendant's collective exhibit B.)

It appears, therefore, that the pricelists intended only for the home market (H55/6 and H56B) described the merchandise as sweet trays or sweet dishes; that the pricelist intended for export (E55) described the merchandise as plaques; and that the pricelist for both export and home market (ER57) described the type of border, and did not designate the merchandise as either sweet dishes or plaques. Some of the same item numbers appear on all the lists, but all numbers do not appear on all lists.

The court below gave the most weight to Price List No. ER57, included in plaintiff's collective exhibit 1, stating (p. 420):

* * * A pricelist freely offering identical items both for home sale and for export is more persuasive of such offerings, than is the statement to the contrary in Mr. Tolley's affidavits. * * * The pricelist, on the other hand, speaks in the language of commerce as of the very time here in issue. It is unequivocal in presenting on a pricelist basis, offers to sell in the home market, and it states what the terms of those offers are.

As to plaintiff's contention that the articles sold for export and in the home market were different, there is nothing in the pricelist plaintiff introduced which supports this contention. Nor are there other proofs. * * *

Appellant argues in this court that Price List No. ER57 was obviously attached to the Tolley affidavit by mistake and that we should correct the error by reference to defendant's collective exhibits A

and B. The purported copy attached to the affidavit is undated, but what appears to be, otherwise, the same pricelist is attached to collective exhibit B and is dated April 29, 1957. This means it took effect too late to apply to the imports at bar. But it leaves unexplained why Tolley used an undated copy and why Macdonald expressly states, in plaintiff's exhibit 2, that from October 1, 1955, to June 1, 1957, sales for export to the United States were made under freely offered prices per Price List No. ER57. Macdonald succeeded to Mr. Tolley's job but not to his records, he says; still, from some source, he obtained another copy of Price List No. ER57, the undated version, and attached it to his affidavit.

The Government, of course, got its pricelists solely from the exporter. It is doubtful from inspection whether any of the pricelists supplied in this case are exact facsimiles or copies of pricelists actually issued to and used by customers. Some of the copies of Price List No. ER57 are undated, raising a question whether any or all copies are full, without omissions. The export pricelist, No. H55/6, attached to defendant's collective exhibit A, refers to pages, apparently in a catalog or brochure not in evidence. So does the domestic pricelist, No. E55. It is not apparent how persons out of the United Kingdom could have ordered merchandise without such a catalog or brochure to guide them.

An examination of the invoices and the various pricelists indicates that the manufacturer had certain stock numbers to which were added letters to designate different types of centers and different component materials. The pricelists generally give a price for the number alone or the number plus a letter, but do not include all the variations shown on the invoices. Even the basic numbers of some invoice items are not on any pricelist. The invoice prices for the variations are not always the same as the prices listed for the number or the number plus a letter. For instance, No. 141 is on all the pricelists at 2/3 and 141 V at 2/6. However, on some of the invoices, 141 V appears at 2/3. The invoices also include B 141 V at 2/6; B 141 VW at 2/10; 1G 141 V at 2/10; BG 141 V at 2/10; C 141 V at 2/10 and at 3/; and X 141 V at 3/3. All of this suggests that there probably were other more complete pricelists or brochures used between September 17, 1955, and April 25, 1957, which are not before us. Thus, even though the pricelist attached to Mr. Tolley's affidavit together with other evidence in the case tend to show that plaques were not offered in the home market, the record is still lacking in proof as to prices (home or export) for many of the imported items.

It is also lacking in proof that the sweet dishes concededly sold in the home market were not similar to the plaques sold for export. The general rule is that merchandise is similar which is made of the same

materials, is of approximately the same value, is commercially interchangeable, and is adapted to the same uses. *United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19, T.D. 42714; *United States* v. *Wecker & Co.*, 16 Ct. Cust. Appls. 220, T.D. 42837; *Scharf Bros. Co. (Inc.)* v. *United States*, 16 Ct. Cust. Appls. 347, T.D. 43089; *H. J. Heinz Company* v. *United States*, 43 CCPA 128, C.A.D. 619. When goods are made of the same material by the same processes, are of equal value, and when finished have no differences which would render them dissimilar for valuation purposes, they are similar, even though the foreign goods might not be accepted in compliance with an order by the user of the imported goods. *United States* v. *Thomas & Co. (Dehler-Signoret Corp.)*, 21 CCPA 254, T.D. 46788.

In the instant case, the plaques and the sweet dishes are made of the same materials, and, as shown by the pricelists, are of approximately the same commercial value. The appraiser must have found, presumably after full investigation, that they were commercially interchangeable and adapted to the same uses. *Reinhold Strauss & Co. et al.* v. *United States*, 31 Cust. Ct. 477, A.R.D. 35; *Albert F. Maurer Co.* v. *United States*, 50 Cust. Ct. 539, A.R.D. 153, affirmed 51 CCPA 114, C.A.D. 845. We are asked to find the contrary despite the use of common stock numbers for domestic items and exports, and despite our not having evidence, which must exist, and which would have the most direct bearing on the issue of commercial interchangeability. This includes (a) samples, (b) catalogs or brochures, and (c) complete pricelists.

The argument is that (1) the domestic so-called sweet dish does not have a hanging ring, while the otherwise similar exported plaque does, (2) because of this difference, the sweet dish was subject to British purchase tax variously stated as 15 percent and 30 percent, while the plaque, if sold in the United Kingdom, would pay 60 percent, and (3) the two articles would also be classified differently for United States tariff purposes. We assume *arguendo* that these things are so. None of them establishes that the articles are not "such or similar" for United States appraisement purposes. " 'Similarity' and its concomitant element 'dissimilarity,' respecting imported merchandise, are issues of fact to be established by proofs, not by inference, argument, or interpretation." *W. R. Zanes & Co. et al.* v. *United States*, 43 Cust. Ct. 568, 572, Reap. Dec. 9557; *Nicholas Gal (Globe Shipping Co., Inc.)* v. *United States*, 38 Cust. Ct. 728, A.R.D. 72, appeal dismissed, 45 CCPA 129.

In the instant case, it has not been shown that the hanging ring is a component adding substantially to the value of the merchandise. We can draw our own conclusion from the fact that it adds nothing to the price. While the merchandise is designated by an elaborate

system of numbers and letters, the same stock numbers are used for plaques and sweet trays or dishes and the variation by added letters do not appear to reflect any difference between the domestic and export versions of the articles.

No evidence has been presented as to actual use of either the domestic or the export versions. The nomenclature in pricelists and affidavits cannot be relied upon to show use. Price List No. H56B describes the merchandise as sweet dishes, No. H55/6 describes them as sweet trays or sweets, and No. E55 as plaques. It may or may not be that the so-called sweet dishes are used in England to serve sweets or desserts or as service trays. They might or might not be used in that way in this country. We take judicial notice that the "sweet" is a mysterious component of a British meal having no exact counterpart in the diet of other nations. In classification cases, at least, the use which governs is the use in this country. *H. Boker & Co. (Inc.)* v. *United States*, 19 CCPA 27, T.D. 44870, at page 29, where the court says: "Our tariff laws are made having consideration for the conditions in this country, and not those in foreign ones."

Whether or not the presence of the ring on the plaques had any significant effect on actual use does not appear. It has not been established whether the ring is permanently attached or can be removed without difficulty. There is nothing to show that *absent* the domestic tax effect, which we do not think relevant, a sweet dish would not be purchased and sold to hang on the wall or a plaque to serve sweets or "the sweet" in. It is common knowledge that certain types of plates and dishes are often hung on walls for decorative effect, and if anyone wishes to do this, the fact that the plate or dish lacks a hanging ring is no impediment. Conversely, the ring might not prevent the plaque from being used for the service of sweets. Without the benefit of samples or testimony by anyone familiar with the actual use of the merchandise or even what uses it is suitable for, we are unable to determine whether there was a lack of commercial interchangeability or significant difference in usage.

If the British authorities recognize a distinction between sweet dishes and plaques, this may only prove that their revenue laws, like ours, contain some anomalies. And in view of the many situations when inconsequential differences—inconsequential except for tariff consequences—in imported articles may cause them to be classed under different paragraphs, we would not say and we believe no court has said, that even if so classed, they cannot be "such or similar" for appraisement purposes. Similarity for classification purposes is different from similarity for value purposes. *Plant Products Corporation* v. *United States*, 44 CCPA 183, C.A.D. 658, and cases cited.

In *Kurt Orban Co., Inc.* v. *United States*, 42 Cust. Ct. 644, Reap. Dec. 9434, and *Same* v. *Same*, 42 Cust. Ct. 649, Reap. Dec. 9435, which

involved deformed concrete reinforcing bars, it was held that a statement in an affidavit that it is the practice in Belgium to use round bars which have not been deformed in producing reinforced concrete, without further evidence of dissimilarity of design, character, and use, was insufficient to establish that similar merchandise was not sold in the home market. The court stated in the case first cited (p. 648):

> Particularly is this true in view of the question and answer appearing on the consular invoices accompanying plaintiff's exhibits 2 and 3 wherein the following appears: "Is such or similar merchandise offered or sold in the home market for home consumption? Yes." Said answers were given by the seller of the merchandise in Brussels, Belgium, at the time of shipment of the instant merchandise and were declared to be true and correct statements before the vice consul of the United States at Brussels.

As stated, in the instant case, the same question appears on the consular invoices which were signed by Mr. Tolley and, in each case, it was answered in the affirmative. This tends to show an inconsistency with Mr. Tolley's statement in his affidavit that brass plaques were not sold in England, or it indicates that he believed the sweet dishes were similar.

It is not incumbent upon the Government to prove that the appraised value is correct, until or unless the importer shows it to be erroneous and establishes a different value in place thereof. *Kobe Import Co.* v. *United States*, 42 CCPA 194, 196, C.A.D. 593. Here, the importer and the Government have presented evidence, but on the basis of the entire record, including defendant's exhibits, the proof is incomplete in many particulars which are needed in order to override the presumption of correctness attaching to the appraisal. No doubt for reasons beyond the control of appellant and its able counsel, the evidence that would enable us to make our own finding as to commercial interchangeability has not been forthcoming, and we cannot say that the appraiser could not have had before him sufficient facts to support his action.

On the record presented, we find as facts:

1. That the merchandise involved herein consists of brass picture plaques, manufactured by The Greenland Manufacturing Company of Birmingham, England, and exported on various dates between September 17, 1955, and April 25, 1957.

2. That the appraisement of the brass picture plaques was made on the basis of foreign value.

3. That, at the times of exportation, such or similar merchandise was freely offered for sale to all purchasers for home consumption in the principal market in England.

4. That the record does not establish a statutory basis of value for such or similar merchandise, under section 402, Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, different from the appraised values.

We conclude as matter of law:

That appellant has failed to overcome the presumptively correct appraised values of the brass picture plaques involved herein and that the value thereof are the values returned by the appraiser.

The judgment of the trial court is affirmed.

Judgment will be rendered accordingly.