(Reap. Dec. 8588)

BAAR & BEARDS, INC. *v.* UNITED STATES

Entry Nos. 897192; 901281.

(Decided June 1, 1956)

*Sharretts, Paley & Carter* (*Howard C. Carter* of counsel) for the plaintiff.
*George Cochran Doub*, Assistant Attorney General (*Daniel I. Auster*, trial attorney), for the defendant.

FORD, Judge: The two appeals listed above raise the question of the proper dutiable value of certain habutae solid-colored scarves, exported from Japan on April 16 and April 25, 1953, and entered at New York on May 25 and June 1, 1953, respectively. In reappraisement No. 234862–A, the merchandise was invoiced at $3.10 per dozen, entered at $2.83 per dozen, f. o. b. Yokohama, and appraised at $2.99 per dozen, f. o. b., net, packed. Plaintiff claims the proper value to be $2.85 per dozen, f. o. b. Yokohama. In reappraisement No. 234863–A, the merchandise was invoiced at $2.99 per dozen, entered at $2.85 per dozen, f. o. b. Yokohama, and appraised at $2.99 per dozen, net, packed. Plaintiff claims the proper value to be $2.87 per dozen, f. o. b. Yokohama. Defendant contends the appraised value is the proper value.

Counsel for the respective parties have, in effect, agreed that merchandise such as or similar to that here involved was not sold or offered for sale for home consumption in Japan, within the provisions of section 402 of the Tariff Act of 1930, and that the proper basis for finding a value for the merchandise is export value. No question is raised in this case regarding the principal market, usual wholesale quantity, or inland freight charges.

At the trial of these two appeals, counsel for the plaintiff offered and there was received in evidence as exhibit 1 an affidavit of Tatsuo Nishiwaki, and the plaintiff rested. The defendant offered in evidence seven reports, which were admitted and marked exhibits A through G. Exhibit A is a report addressed to the Commissioner of Customs, Washington, D. C., and is signed by Lester D. Johnson, appraiser of merchandise. Exhibit C is a report addressed to Department of State and signed by Laurence W. Taylor, American consul general. The other reports bear the heading: FOREIGN SERVICE OF THE UNITED STATES OF AMERICA, OPERATIONS MEMORANDUM, and are addressed to Department of State. These reports do not bear the signature of any one, but the party making these reports has been properly iden-

tified as "officers of the Government" by a certificate signed John Foster Dulles, Secretary of State. In my opinion, this brings these reports within the class of documents made admissible in evidence by 28 U. S. C. § 2633, which provides that:

In finding the value of merchandise, in reappraisement proceedings before a single judge of the Customs Court, affidavits and depositions of persons whose attendance cannot reasonably be had, price lists and catalogues, reports or depositions of consuls, customs agents, collectors, appraisers, assistant appraisers, examiners, and other officers of the Government may be admitted in evidence.

Accordingly, these reports have been admitted in evidence and marked as indicated above.

No oral testimony was offered in this case, and the record, therefore, consists of the official papers and the documents listed above.

Exhibit 1, being an affidavit of Tatsuo Nishiwaki, is in the following language:

1. I am Manager of Z. Horikoshi & Co., Ltd. of 211 Yamashitacho, Nakaku, Yokohama and have held this position or positions of similar responsibility for the last three years.

2. My company sells silk scarfs and other articles for exportation to the United States and I personally supervise such sales. At all times during the period referred to in paragraph 1 hereof, I have been well acquainted and I am thoroughly familiar with the prices at which silk scarves have been freely offered for sale and sold for exportation to the United States in Tokyo, Yokohama, and Kobe, which are the principal markets of Japan for the sale of such merchandise by my company and by others who sell such merchandise.

3. On or about July, 1951 the Ministry of International Trade and Industry, commonly known as "MITI", an agency of the Japanese government having jurisdiction over the issuance of export licenses for the exportation of silk scarves from Japan, began a survey of the Japanese scarf industry for the announced purpose of discovering ways and means for the economic stabilization of the Japanese silk scarf industry. The Japanese Scarf Manufacturers Association and MITI officials held a great many meetings and every manufacturer submitted cost of production statements for each of the styles of scarves that it manufactured. On or about September 1951 MITI began to refuse to issue export licenses for shipments of silk scarves that had been sold at a price lower than MITI considered to be the median cost of production of that item in the industry. There was never any publication of the prices that MITI considered to be the lowest prices at which the product should be sold, but the approximate amount of the price (which has become known as the "check price") can be and was determined by submitting a series of invoices covering the same article in connection with the application for an export license. For instance, if an export license application covering silk scarves of a specific size, quality and print is denied when the selling price was shown to be $2.75 per dozen or $2.78 per dozen, but is granted when the price was $2.80 per dozen, I know that the "check price" is either $2.79 or $2.80, but the "check price" has no relationship whatsoever to the price at which the merchandise was freely offered for sale and was sold. During the period from September 1951 to date, actual market prices have often been lower than "check prices".

4. On or about April 3, 1953, I sold 101½ dozen 4 momme Habutae Solid colored scarves with handrolled hems, 33¼″ by 35¼″, Grade A to Baar & Beards,

Inc. of New York City at $3.10 per dozen, F. O. B. Yokohama. My company exported these scarves to the United States in a case marked H. E. 2063 laden aboard the S. S. Surabaya Maru which sailed from Japan on April 16, 1953. On April 16, 1953 silk scarves identical with those shipped were freely offered for sale and were sold to all persons in Tokyo, Yokohama and Kobe, the principal markets of Japan for the sale of such merchandise for exportation to the United States at $2.85 per dozen F. O. B. Yokohama, and the price did not vary by reason of the quantity purchased. Said price of $2.85 per dozen included the cost of all containers and coverings of whatever nature, and all other costs, charges and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States. To the best of my knowledge and belief, the "check price" on April 16, 1953 for these scarves was $2.99 per dozen, F. O. B. Yokohama but all offers of sale and sales of identical merchandise and of merchandise substantially similar in quality and weight of material, quality of workmanship, dyed in the same or similar colors and produced or manfuctured at about the same cost of production on that date (April 16, 1953) were sales or offers for exportation to the United States at $2.85 per dozen, F. O. B. Yokohama. Merchandise identical with or substantially similar to the merchandise herein described is not and has never been sold or offered for sale for consumption in Japan.

The above affidavit refers in particular to the merchandise covered by reappraisement No. 234862–A.

At the bottom of page 2 and at the top of page 3 of defendant's exhibit A appears the following:

* * * The merchandise covered by Consular Invoice Number 22466, certified at Tokyo, Japan, April 24, 1953, was ordered by BAAR and BEARDS, Inc., through their Tokyo representative on April 10, 1953, and is covered by K. Kachi & Company's contract No. 225, which was for 100 dozen 4 momme habutae silk scarves, style number 5100, solid color, hand rolled hems, at a unit price of $2.87 per dozen, F. O. B. Yokohama. Payment for this shipment was made by means of Letter of Credit No. 60223 issued by the Bank of Manhattan Company in the sum of $305.98, which represents 101½ dozen scarves at $2.99 per dozen, totalling $303.48 plus $2.50 consular fee. $2.99 per dozen was the check price for this type of merchandise on the date of exportation concerned and the difference of 12 cents per dozen was paid in yen to the Tokyo office of Baar and Beards, Inc., on December 17, 1953.

The above statement refers to the merchandise covered by reappraisement No. 234863–A.

To the report by Lester D. Johnson, appraiser of merchandise, regarding the market conditions in Japan for silk scarves—exhibit A—is attached that which is claimed to be the original Japanese text of the Foreign Exchange and Foreign Trade Control Law, and translations thereof into English, marked exhibits "A" and "A–1," respectively; that which is claimed to be the Japanese text, and a translation thereof, of the Export Trade Control Order, marked exhibits "B" and "B–1," respectively; that which is claimed to be the Japanese text, and a translation thereof, of the Ministry of International Trade and Industry Establishment Law, marked exhibits "C" and "C–1," respectively; and a copy of that which is claimed to be the text of

the Cabinet Order for the Organization of the Ministry of International Trade and Industry, with a purported translation thereof, marked exhibits "D" and "D–1," respectively.

At the time this report was offered and admitted in evidence, the court relied upon counsel offering it and also upon counsel for the importer to see that the so-called foreign laws had been properly authenticated and that the translations thereof had been properly and correctly made according to law. However, upon examination of these so-called foreign laws and the translations thereof, the fact is disclosed that the foreign laws are not properly authenticated, as required by law. So far as any authentication or identification is concerned, these so-called foreign laws bear nothing which might not have been placed thereon in any ordinary English or Japanese printing plant. The same situation prevails with reference to the translations attached to said exhibit.

In volume 1, page 634, Greenleaf on Evidence, under the heading "Foreign Laws," it is stated:

In regard to *foreign laws*, the established doctrine now is, that no Court takes judicial notice of the laws of a foreign country, but they must be proved as facts. And the better opinion seems to be, that this proof must be made to the Court, rather than to the jury. "For," observes Mr. Justice Story, "all matters of law are properly referable to the Court, and the object of the proof of foreign laws is to enable the Court to instruct the jury what, in point of law, is the result of the foreign law to be applied to the matters in controversy before them. The Court are, therefore, to decide what is the proper evidence of the laws of a foreign country; and when evidence is given of those laws, the Court are to judge of their applicability, when proved, to the case in hand." [Italics supplied.]

     *       *       *       *       *       *       *

In general, foreign laws are required to be verified by the sanction of an oath, unless they can be verified by some high authority, such as the law respects, not less than it respects the oath of an individual. The usual mode of authenticating foreign laws (as it is of authenticating foreign judgments), is by an exemplification of a copy, under the great Seal of a State; or by a copy proved to be a true copy, by a witness who has examined and compared it with the original; or by the certificate of an officer properly authorized by law to give the copy; which certificate must itself also be duly authenticated. * * *

In the case of *Church* v. *Hubbart*, 2 Cranch 187, 2 L. ed. 249, in refusing to accept as evidence a foreign law which had not been properly authenticated, Chief Justice Marshall, speaking for the Supreme Court of the United States, held as follows:

Admitting the originals in the Portuguese language to have been authenticated properly, yet there was error in admitting the translation to have been read on the certificate of the consul. Interpreters are always sworn, and the translation of a consul not on oath can have no greater validity than that of any other respectable man.

If the court erred in admitting as testimony papers which ought not to have been received, the judgment is of course to be reversed and a new trial awarded. It is

urged that there is enough in the record to induce a jury to find a verdict for the defendants, independent of the testimony objected to, and that, in saying what judgment the court below ought to have rendered, a direction to that effect might be given. If this was even true in point of fact, the inference is not correctly drawn. There must be a new trial, and at that new trial each party is at liberty to produce new evidence. Of consequence this court can give no instructions respecting that evidence.

The judgment must be reversed with costs, and the cause remanded to be again tried in the circuit court, with instructions not to permit the copies of the edicts of Portugal and the sentence in the proceedings mentioned to go to the jury, unless they be authenticated according to law.

See also *Joshua C. Pierce* v. *Ole A. Indseth*, 106 U. S. 546, 27 L. ed. 254.

Following what I perceive to be the law, as announced in the above cases, I am constrained to disregard as evidence the so-called foreign laws of Japan, known as MITI, and also the translations thereof, appearing as exhibits "A" and "A-1" through exhibits "D" and "D-1," attached to said exhibit A.

Defendant's exhibit B contains the following statement, regarding a sale of scarves by K. Oyama & Co. of Yokohama to Durlacher & Co. of New York:

*Relationship:* K. Oyama & Co. is the manufacturer of the commodity described in the invoice, which was sold to the shipper through the supplier. The shipper shipped the commodity to the importer in the states. The head office of the shipper is located at No. 96 Wall Street, New York, and the documents were relayed from the head office to the local branch office. The negotiations were made between the head office of the shipper and the importer. The letter of credit (@$3.77 per dozen) was sent from the importer through the head office to the branch office (shipper) in Japan, the whole amount of which was assigned to Nikko Bussan Kaisha and the branch office (the shipper) received the difference between the amount of the letter of credit and the amount to be received by the supplier ($3.53 per dozen), i. e. $3.77− $3.53=$0.24 per dozen from the supplier. However, the shipper obtained $0.12 per dozen as brokerage and the remaining $0.12 was kept apart in order to pay it back to the importer because the merchandise covered by the invoice was originally ordered and confirmed at $3.65 per dozen F. O. B. Yokohama, and it was invoiced at the value of $3.77 per dozen in order to meet the MITI's check price for obtaining an export license.

\* \* \* \* \* \* \*

It can be presumably considered that the check prices exist only to the extent of forcing the exporters to invoice their merchandise at MITI's check prices in order to obtain an export license for the merchandise. Because some exporters (Japanese and foreign), including the shipper, had shipped merchandise at a value below the check prices and the balance was, or is, paid back to the importers when he came or comes to Japan, or it is kept in custody of the exporters until the balance of the letter of credit is cleared. \* \* \*

Defendant's exhibit C contains the following statement, with reference to a sale of silk handkerchiefs by Mutoh Shoten of Yokohama to Virchand Panachand Co., Inc., of New York:

\* \* \* In order to obtain an export license from MITI the seller conformed to the "check price" level (column 9). Payment was actually effected by letter of credit at the "check price" level of US $1.29 per dozen, however the seller issued a credit memorandum to the United States importer in the amount of US $960.00. This credit brought the price into conformity with that shown (US $1.05 per dozen) in Enclosure I. Various methods are employed to liquidate such credits.

\*        \*        \*        \*        \*        \*        \*

\* \* \* Practically, check prices exist in some cases only to the extent of forcing the exporters to invoice their merchandise at MITI check prices in order to obtain export licenses for the merchandise. MITI is aware, however, of the present practice of arranging credits.

Defendant's exhibit D contains the following:

Supply and demand factors make it necessary for the Japanese seller to bid competitively on the market; often below check price levels. Expedients such as privately arranged credits to the importer are then set up. Check prices exist only to the extent of forcing the exporters to invoice their merchandise at MITI levels in order to obtain export licenses for shipment of the merchandise.

Defendant's exhibit F contains the following statement:

The unit price described in column 9 of the Consular Invoice was the price approved by MITI (Ministry of International Trade and Industry) and is referred to as the "check price". The seller conformed to the MITI check price in order to obtain an export license. The unit price described in column 11 is in conformity with the check price and supposedly reflects the export price at the time the invoice was issued. In reality the agent and the seller had contracted the merchandise at US $3.70 per dozen with an agreement that the difference of $0.06 per dozen would be refunded to the agent in Yen after the MITI check price had been paid \* \* \*.

The transaction was thus consummated at the MITI price level, payment being made for the full invoiced amount of $15,040.00, however, a rebate was made after the initial payment in the amount of $360.00 converted to Japanese Yen to Messrs. Ziskind Fujisawa Co., Tokyo who acted as agent for Marvin Accessories Inc.

Defendant's exhibit G contains the following:

The difference between the check price and the contracted price, amounting to US $500.00 was paid to the importer, which may be described as a rebate. The transaction was consummated by irrevocable letter of credit at the MITI check price level of $2.83 doz., $1.25 doz., and $0.85 dozen, with subsequent rebate to importer as stated above.

\*        \*        \*        \*        \*        \*

Japanese exporters, however, have not maintained their front and contracted prices have been cut below check price levels in a sensitive competitive market. \* \* \* MITI's control, therefore, existed only to the extent of forcing the exporters to invoice their merchandise at MITI check prices in order to obtain export licenses.

Based upon this record, counsel for the plaintiff contends "that the dutiable export value of the imported merchandise is $2.85 per dozen in reappraisement 234862–A and $2.87 per dozen in reappraisement 234863–A." Counsel for the defendant contends that:

This case does raise the question of the ordinary course of trade and whether it is reflected by a so-called "MITI" or "check" price, or by a lower selling price whereby the exporter issues a refund credit in Japanese yen in an amount equal to the difference between the "MITI" price and the said lower price to some but not all importers in relation to some but not all transactions, * * *.

It is my view that the contention of defendant set out above is answered by the following quotation from defendant's exhibit D, regarding the market conditions in Japan for silk scarves for exportation to the United States at or about the dates of exportation herein:

Supply and demand factors make it necessary for the Japanese seller to bid competitively on the market; often below check price levels. Expedients such as privately arranged credits to the importer are then set up. Check prices exist only to the extent of forcing the exporters to invoice their merchandise at MITI levels in order to obtain export licenses for shipment of the merchandise.

In *United States* v. *Michele Diagonale*, 22 C. C. P. A. (Customs) 517, T. D. 47497, the Court of Customs and Patent Appeals held that the mere fixing of minimum prices on merchandise by a governmental agency without further restrictions did not constitute a controlled market in the sense that such prices may not be considered in determining the value of merchandise, in which it employed the following language:

* * * that competition in the price of merchandise in the country of exportation is not an indispensable element in establishing the foreign value thereof, and it necessarily follows that the mere fact that an association fixes the price at which its members shall sell merchandise, without any restrictions upon the purchasers thereof, does not constitute a controlled or restricted sale in the sense that such price may not be considered in determining the foreign value of merchandise.

Section 2633, 28 U. S. C., contains the following provision:

In finding the value of merchandise, in reappraisement proceedings before a single judge of the Customs Court, affidavits and depositions of persons whose attendance cannot reasonably be had, price lists and catalogues, reports or depositions of consuls, customs agents, collectors, appraisers, assistant appraisers, examiners, and other officers of the Government may be admitted in evidence.

The language in the *Diagonale* case, *supra*, "does not constitute a controlled or restricted sale in the sense that such price may not be considered in determining the foreign value of merchandise" in no sense of the word denies to this court its right and duty to consider and weigh affidavits and other evidence against contradictory evidence in any case this court may be considering. The language quoted from the *Diagonale* case, *supra*, leaves this court free to consider and weigh affidavits and other evidence against evidence as to price fixing, together with all other evidence before this court in a given case, and, in all cases, it is the duty of this court to consider and weigh all the evidence before it in arriving at a dutiable value for imported merchandise.

Therefore, in this case, I shall consider the evidence before me regarding the fixing of minimum prices by the Ministry of Internal Trade and Industry of Japan so far as it is properly before me, the affidavit of Tatsuo Nishiwaki, exhibit 1, together with all other evidence before me in this case, and, upon the weight thereof, determine the value of the silk scarves involved.

In *United States* v. *Sabin*, 12 Ct. Cust. Appls. 520, T. D. 40731, in passing upon the weight to be given to an uncertified law of Cuba, a report of a special agent, and a sworn declaration of a witness for the importer, the Court of Customs Appeals held as follows:

Accepting the uncertified law of Cuba and the report of the special agent as evidence, it can not be said that they impeach the sworn declaration of the witness for the importer who testified that there was very little difference in the prices quoted by Cuban dealers for the merchandise imported and that the importer cabled each time for prices and received a discount from such prices of 5 per cent and 3 per cent.

In this case, I have the uncertified check price decree, known as MITI, which was established under authority of the Export Control Order, which, in turn, was issued pursuant to the Foreign Exchange and Foreign Trade Control Law, a number of reports by Government agents or agencies, and the sworn affidavit of Tatsuo Nishiwaki. It will be seen, therefore, that the situation in this case is not unlike that in the *Sabin* case, *supra*. It would appear that if, as held in the *Sabin* case, *supra*, the uncertified law of Cuba and the report of the special agent were not sufficient to impeach and overcome the sworn declaration of the witness for the importer, that the uncertified check price decree, known as MITI, as set out above, and the reports of the Government agents or agencies should not be held to be sufficient to overcome and impeach the sworn testimony of Tatsuo Nishiwaki in this case.

In *R. Mohr & Sons* v. *United States*, 16 Ct. Cust. Appls. 448, T. D. 43198, the Court of Customs Appeals stated as follows:

Counsel for importers presented their case upon the theory, and evidence was introduced to support it, that there was a foreign but no export value for first-quality binoculars, and that there was an export but no foreign value for second-quality binoculars. It was not disputed that the foreign value of "selected" binoculars was $11 each. It is claimed, and evidence was introduced to support it, that the export value of the involved binoculars was approximately $7 each.

In an effort to contradict and overcome the evidence offered by the importer in the *Mohr* case, *supra*, as detailed in the above quotation:

The Government introduced in evidence Exhibit 3, a report of a Government agent. In many respects this report is consistent with the information furnished by importers. The report shows that it is very difficult to manufacture perfect binoculars; that it is not correct to designate those sold in Germany for home consumption as first quality, and those sold for export to the United States as second

quality, but that it would be more accurate to describe the former as selected quality, and the latter as "unsorted" quality. * * *

The Court of Customs Appeals then considered an affidavit offered by the Government, concerning which, being considered in connection with the evidence offered by the importer, it is stated as follows:

The Government offered in evidence Exhibit 2, an affidavit of one William A. Ritz. In view of its importance, we quote it:

*       *       *       *       *       *       *

William Ritz, being duly sworn, deposes and says that he is an importer of merchandise of the character the subject of these reappraisements; that he has been importing such merchandise for a period of five years; that he is and has been the sole agent for the Hensoldt Handelsgesellschaft, Wetzlar, Germany, for the past five years; that he examined the official sample marked Exhibit 4, reappraisement 49577-A, etc.; that from his examination he finds said exhibit to be representative of the first-quality binoculars manufactured by the Hensoldt Handelsgesellschaft.

Your deponent further says he received quotations of the prices of binoculars of the first quality manufactured by the Hensoldt Handelsgesellschaft, Wetzlar, Germany, as follows:

EIGHT BY TWENTY-FOUR HENSOLDT BINOCULARS

| | |
|---|---|
| Sept. 4, 1924 | $11. 30 |
| Sept. 9, 1924 | 11. 00 |
| Sept. 23, 1924 | 11. 00 |
| Oct. 2, 1924 | 11. 00 |

That there was no appreciable change in the value of the merchandise similar in all material respects to the merchandise the subject of this reappraisement during the year 1924.

Your deponent is of the opinion and belief, based upon his familiarity, that the market value on the date of exportation herein, July 16, 1924, of the merchandise in question was $11.00 each.

*       *       *       *       *       *       *

It will be observed that the witness Ritz stated that the official sample, Exhibit 4, was representative of the first quality of binoculars, manufactured and sold for home consumption in Germany; that there was "no appreciable change in the value" of the involved merchandise during the year 1924; and that the foreign value thereof during that year was $11.00 each. This is some substantial evidence. See *United States* v. *Wiener*, 15 Ct. Cust. Appls. 428, T. D. 42594. It supports the judgment below. * * *

The *Sabin* and *Mohr* cases, *supra*, would appear to be ample authority to support a holding that the affidavit of Tatsuo Nishiwaki was sufficient to outweigh and to overcome the uncertified check price decree, known as MITI, and the reports of the Government agents or agencies. The Government has offered little, if any, evidence to establish a value for silk scarves in Japan, basing its case upon the contention that the sale of silk scarves in Japan at any price, other than the unpublished and unannounced MITI price, was not a sale in the ordinary course of trade, and, therefore, could not be considered in arriving at an export value for said scarves.

Based upon the weight of the evidence before me in this case, I find the proper dutiable export value of the merchandise covered by reappraisement No. 234862–A to be $2.85 per dozen, f. o. b. Yokohama, and for the merchandise covered by reappraisement No. 234863–A, I find the proper dutiable export value to be $2.87 per dozen, f. o. b. Yokohama.

Judgment will be rendered accordingly.