UNITED STATES *v.* CONTINENTAL FORWARDING, INC. (No. 5175)*

United States Court of Customs and Patent Appeals, July 7, 1966

*John W. Douglas*, Assistant Attorney General, *Andrew P. Vance*, Chief, Customs Section, *Glenn E. Harris* for the United States.

*Sharretts, Paley & Carter (Joseph F. Donohue*, of counsel) for appellee.

*C.A.D. 885.

[Oral argument April 6, 1966 by Mr. Harris and Mr. Donohue]

Before RICH, Acting Chief Judge, and MARTIN, SMITH, and ALMOND, Associate Judges

SMITH, Judge, delivered the opinion of the court:

This appeal by the Government challenges the decision [1] of the Customs Court, Second Division, Appellate Term, hereafter appellate court, overruling the appraised values and ordering the case remanded to the trial court for a determination of the export value of certain imported binoculars. The issue here for determination is whether there is substantial evidence in support of the appellate court's ruling.

Initially, the facts concerning the importation of the binoculars may be briefly commented on. This appeal stems from an appeal to reappraisement in which the sole problem below was concerned with determining export values of the binoculars for customs purposes. The exportation of binoculars from Japan is controlled to some extent by an agency of the Japanese Government, the Ministry of International Trade and Industry (hereafter MITI). In order to import the binoculars, appellee was required to deposit a certain amount of U.S. dollars in Japan. In return appellee received the binoculars and a certain amount of Japanese yen. The Government's position here is that the amount of U.S. dollars deposited in Japan, which the appraiser adopted as the export value, is the proper export value. Appellee argues the export value is less than this amount because of the Japanese yen received along with the binoculars.

The foregoing summary of essential facts provides a ready guide for examination of the dispute in greater detail. First the pertinent provisions of the statutes may be set forth. "Export value" is defined in Sec. 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (19 USC 1401a.), as follows:

§ 1401a.   Value—Basis

\*          \*          \*          \*          \*          \*          \*

*Export value*

(b) For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

Further definitions relevant here appearing in sec. 1401a are as follows:

---

[1] 52 Cust. Ct. 629, A.R.D. 171, reversing 46 Cust. Ct. 579, R.D. 9910.

*Definitions*

(f) For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

\*         \*         \*         \*         \*         \*         \*

(4) The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which export value, United States value, or constructed value, as the case may be, can be satisfactorily determined:

(A) The merchandise undergoing appraisement and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, the merchandise undergoing appraisement.

(B) Merchandise which is identical in physical characteristics with, and was produced by another person in the same country as, the merchandise undergoing appraisement.

(C) Merchandise (i) produced in the same country and by the same person as the merchandise undergoing appraisement, (ii) like the merchandise undergoing appraisement in component material or materials and in the purposes for which used, and (iii) approximately equal in commercial value to the merchandise undergoing appraisement.

(D) Merchandise which satisfies all the requirements of subdivision (C) except that it was produced by another person.

According to the evidence of record, persons seeking to export certain goods, such as the binoculars here in issue, were subject to "The Foreign Exchange and Foreign Trade Control Law (Law No. 228, December 1, 1949)," as amended. Chapter VI, titled Foreign Trade, provides in pertinent part:

(Principal of export)

Article 47. Export of goods from Japan will be permitted with the minimum restrictions thereon consistent with the purpose of this Law.

(Approval of export)

Article 48. Any person desiring to export goods from Japan may be required to obtain the approval of the Minister of International Trade and Industry for those types or areas of destination of export goods and/or method of transactions or payments as provided for by Cabinet Order.

2. The restrictions provided for by Cabinet Order specified in the preceding paragraph shall be within the limit of necessity for the maintenance of the balance of international payment and sound development of international trade or national economy.

(Certification of payment method)

Article 49. The Minister of International Trade and Industry may by ordinance require from any person desiring to export goods an adequate certification that satisfactory payment is provided as provided for by Cabinet Order.

The parties agree that in order to export the binoculars it was necessary for the exporter, first, to obtain the approval of MITI and second, to provide, if required, an adequate certification that satisfactory payment is provided.

Appellee called four witnesses in attempting to establish export value and the procedure followed by the trade in the exportation of binoculars from Japan. The procedure may be summarized as follows. A person seeking to import binoculars into the United States would select a Japanese supplier. A contract would be entered into wherein the importer would agree to purchase the binoculars described in the contract. Two prices would be set forth in the agreement, the higher price being the MITI price and the lower price being the "contract price." The difference between the MITI price and the contract price would be paid to the importer in Japanese yen which was available for use in Japan only, for any purpose except the purchase of goods on the MITI list. After the contract was executed, the importer opened a line of credit in American dollars equal to the amount of the MITI prices for the goods and the Japanese yen would be deposited to the account of the importer.

The parties stipulated certain facts which were set forth in the opinion of the appellate court as follows:

The Tokyo-Yokohama area was the principal market in Japan for the sale of binoculars, such as or similar to plaintiff's exhibit 1.

Export value was the proper basis for appraisal, and the values claimed by appellant are based on export value.

The price of such binoculars did not vary by reason of the quantities purchased.

Sales of binoculars, such as or similar to plaintiff's exhibit 1, were made to anyone who wished to purchase for exportation to the United States, without any restrictions as to use, disposition, resale price, territory of resale, or in any other respect.

The Japanese laws, rules, and regulations applicable to the exportation to the United States of certain products, including binoculars, such as or similar to plaintiff's exhibit 1, and English translations thereof, were received in evidence.

It was further stipulated that any amendments or supplements to any of the foregoing laws, rules, or regulations may be introduced by consent of the parties, together with true translations thereof.

The trial court, after setting forth provisions of United States and Japanese law, quoted supra, and the above stipulations, was of the view that,

The effect of the foregoing stipulated facts leaves for determination herein, in finding dutiable export value, the price of binoculars, such as or similar to the items in question, "in the ordinary course of trade," * * *

After setting forth a detailed summary of the testimony of the witnesses, the trial court was of the opinion that,

* * * The use of so-called draft invoices to obtain export permits in the class of transactions covered in plaintiff's evidence suggests an unusual method of doing business, not within the purview of the controlling statute herein.

\* \* \* \* \* \* \*

*. * * In this case, plaintiff has confined its proof to the dealings in the foreign market between Japanese agents and certain American importers in a trade practice that does not, in my opinion, reflect the ordinary course of trade in the principal market of Japan at the time of exportation of these binoculars.

\* \* \* \* \* \* \*

* * * Under the statutory presumption of correctness that attaches to the values found by the appraiser (28 U.S.C. § 2633), the "MITI" prices, at which the items under consideration were appraised, embody all of the elements within the controlling statutory definition of export value, set forth in the Customs Simplification Act of 1956, supra.

The trial court stated, as a finding of fact, the following:

(3) That the values found by the appraiser for these binoculars are prices set up by the Ministry of International Trade and Industry of Japan, a duly organized governmental agency established pursuant to law.

It held, as a matter of law,

(2) That the evidence adduced herein is insufficient to overcome the presumption of correctness (28 U.S.C. § 2633) that is attached to the values found by the appraiser.

As previously stated, the appellate term reversed the decision of the trial court. The Government, as appellant here, argues for the correctness of the decision of the trial court. The opinion of the appellate court will be considered in view of the errors alleged by appellant.

Appellant first alleges that it was error to hold that "export value" within the meaning of the statute could be any price other than MITI prices. It is reasoned that prices lower than MITI prices are in violation of Japanese law and therefore illegal and an improper basis for "export value" within the meaning of United States law.[2]

---

[2] This question has been raised before in this court but not decided. *United States v. Baar & Beards, Inc.*, 46 CCPA 92, C.A.D. 705. There the appeal was disposed of on the same ground advanced by the trial court here, i.e., the evidence of the importer was insufficient to overcome the presumption of correctness that attached to the values found by the appraiser and establish a correct export value.

The appellant elaborates further that the MITI price system was designed to "establish minimum lawful export prices" and not "merely to accomplish some vaguely defined 'control' over foreign exchange." Appellant cites Article 4 of the "Ministry of International Trade & Industry Establishment Law (Law No. 275, July 31, 1952)" which provides, in pertinent part, as follows:

Article 4. (Powers of the Ministry) For the purpose of carrying out the responsibilities provided for in this Law, the Ministry of International Trade and Industry shall have the powers as listed below. Such powers shall, however, be exercised in accordance with law (including orders issued thereunder).

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(16) To carry out export and import;

(17) To restrict or prohibit export or import;

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(20) To prohibit or restrict transactions, etc., in foreign exchange relating to international trade;

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(26) To exercise controls on prices and others relative to materials under its jurisdiction;

Appellant argues MITI fixes minimum prices and sales below these are in violation of the above law.[3] Appellant also relies on certain statements made in a letter from Lester D. Johnson to the Commissioner of Customs, dated January 18, 1955 (introduced as appellee's collective exhibit No. 4), which states:

On January 13, 1955, in company with interpreter Takao AOKI, I interviewed Mr. Kensaku MAEDA, Chief of the Export Section, Ministry of International Trade and Industry, Japanese Government. Mr. MAEDA supplied the following information:

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

&ast; &ast; &ast; The regulations of the Ministry of International Trade and Industry have the effect of law and violations of these regulations are considered to be violations of law. The exportation of any merchandise for which check prices have been established would be considered to have been exported contrary to law if made at less than the official check price. Such violations, if legally provable, would result in suspension of export privileges for the offender for a period of not to exceed one year. No other penalty is provided for. In no instance, however, has this penalty been imposed on any exporter because of the extreme difficulty of securing legal proof of such violations. The Ministry of International Trade and Industry has been aware that many violations of the check price system have occurred through rebating, false invoicing and similar practices in the silk scarf and sewing machine heads industries but does not believe that similar violations have occurred to any substantial extent in other industries. There was no restriction by the Ministry of International Trade and Industry as to resale or use of any merchandise exported nor any restriction as to price other than minimum price. The Ministry of International Trade and Industry does not make available to exporters the actual check prices for merchandise exported but refuses to grant export permission in those cases where the merchandise is invoiced at prices below the check prices in effect.

---

[3] Appellant argues here the illegality of the prices per se; the comments of the trial court as to the agency arrangements and "ordinary course of trade" need not be considered.

Appellant's brief states:

\* \* \* That controlling export prices in the manner shown in this record may contribute to the broader "control" of foreign exchange, which it is undoubtedly intended to do, is no justification for declaring, as did the court below, that such controls were not intended to specify minimum export prices for certain categories of goods, including the binoculars here in issue. Indeed, to the extent that such "check prices" were surreptitiously evaded, it is obvious that such evasion tended to defeat the broader purposes of the Law, viz. to enhance the acquisition by Japan of foreign exchange, for the inevitable tendency of the secretive yen rebates was to make it unnecessary for American importers to purchase, with additional dollar remittances, the yen used to defray travelling expenses, etc. in Japan.

The opinion of the appellate court answered the above argument as follows:

It is contended by the appellee that the procedure above described is evasive and violates the laws of the Imperial Government of Japan. We find no evidence in the record to substantiate this claim. This practice has been followed by the witnesses for a number of years not only with respect to binoculars but also with regard to silk wearing apparel. *Baar & Beards, Inc.* v. *United States*, 37 Cust. Ct. 552, Reap. Dec. 8696, affirmed in *United States* v. *Baar & Beards, Inc.* 40 Cust. Ct. 874, A.R.D. 85 (one judge dissenting), reversed in *United States* v. *Barr & Beards, Inc.*, 46 CCPA 92, C.A.D. 705.

It appears from the opinion, in that case, that the control system described herein was followed at the time of exportation of the merchandise there involved between April and June 1953.

It would seem that if this course of action was in violation of Japanese laws, it would have been the subject of correction by Japanese authorities at the administrative or judicial level.

\*     \*     \*     \*     \*     \*     \*

Appellee's contention that the Imperial Government establishes, in substance, the statutory value for the subject merchandise at the so-called "MITI" prices, loses sight of the fact that market value, in a tariff sense, is the price fixed by merchants and dealers in given commodities rather than, as in this case, the artificial price fixed by the Ministry.

The practice and conditions surrounding the purchase, payment, and exportation of merchandise of the class or kind under consideration involve primarily a financial manipulation of funds available to pay for the merchandise with provision made for the use in Japan by the importer of the balance between the "contract" or market price and the "MITI" price.

As well stated by counsel for appellant in oral argument, "MITI" does not fix the market value of merchandise, it regulates conditions pertaining to the exportation of merchandise.

The instant shipments were purchased and exported in conformity with the avowed underlying principles set forth in the Foreign Exchange and Foreign Trade Control Law, *supra*, that is—

\* \* \* to provide for the control of foreign exchange, foreign trade and other foreign transactions, necessary for the proper development of foreign trade and for the safeguarding of the balance of international payments and the stability of the currency, as well as the most economic and beneficial use of foreign currency funds, for the sake of the rehabilitation and the expansion of the national economy.

As previously stated, MITI established a control system pursuant to Japanese laws to govern the exportation of merchandise from Japan, which was properly observed in this case. The net result is that the system not only favored the importer in securing its merchandise at less than MITI prices, but also contributed to the economy and financial structure of the Imperial Government by requiring the importer to use in Japan the money remitted to the company at the time of exportation. The entire transaction was in harmony with the letter and spirit of the Japanese control law.

**Appellee's brief supports the above reasoning as follows:**

Appellant's brief departs from the evidence when it suggests that the purpose of the MITI regulations was to establish minimum *prices* at which it would permit export * * * MITI issued a permit for exportation when it was satisfied that a letter of credit in foreign currency in an adequate amount was being tendered. *It did not fix a price* as Appellant's brief * * * acknowledges. It approved or disapproved exportation. It took no interest in the amount of money actually received by the seller. It was interested only in the amount of foreign currency paid into a designated bank. It took no steps to disallow credits for the difference between contract and so-called MITI prices. It must have known that such difference existed, since invoices in the amount of the contract prices were submitted to it, and the contract prices were freely publicized and fairly stable * * *

All of the evidence is consistent in establishing that the method of payment was to deposit American currency equal to the MITI price but to receive rebates for the difference between MITI and contract prices. The contract prices were publicized. Arrangements, far from being "surreptitious" as argued by Appellant were openly conducted in and through the banks that received the letters of credit. The method of doing business, according to the unchallenged testimony, prevailed over a five-year period, was followed by the companies represented by all witnesses in this case, and is therefore supported by very substantial evidence. This has not been challenged by Appellant.

*        *        *        *        *        *        *

* * * Foreign law may not be judicially noticed. Its terms and administration are questions of fact to be proved like any other fact. *Church* v. *Hubbard*, 6 U.S. 187, 2 Cranch 187. There is no proof here that the described method of purchasing was illegal. To the contrary, it was well established as the ordinary course of business. It was therefore within the law as administered. The court will accept the testimony of informed business men on the administration and operation of a foreign law. *United States* v. *Allenby*, 20 C.C.P.A. (Customs) 80, 89, T.D. 45703. The interpretation of the law attempted by Appellant in its brief * * * is not proper because not supported by testimony or other evidence.

Without detracting from the thorough consideration given the evidence by the appellate court, we observe that appellant has failed to establish by competent evidence its contention that the trade practice described is in violation of Japanese law as applied. All we have of record on behalf of appellant is the terms of the laws and an unsworn statement as to alleged violations of Japanese laws which suggests that the laws are not enforced. The evidence submitted by appellee and relied on by the appellate court is more adequate and of greater weight than that submitted by appellant. Their arguments

and reasoning based thereon are more convincing than are the arguments and reasoning advanced by appellant. Clearly, the decision of the appellate court is supported by substantial evidence on this point and therefore appellant has not demonstrated error.

Absent the issue as to the legality of the trade practice, appellant argues that it has submitted evidence in support of the MITI prices as being the proper export value. Appellant introduced an affidavit of one Mr. Kimura which states that he sold binoculars to appellee at MITI prices, granting no refund or rebate from those prices. Appellant's brief states:

* * * the court was in error in disregarding the evidence (and the presumption) as to the price at which merchandise conforming to the description in category (1) was *actually sold*. The exporter's *motive* in freely selling or offering the merchandise at those particular prices was not properly before the court below, which apparently chose to disregard the evidence merely for the reason that the prices corresponded to the MITI minimum "check prices."

Appellant further stresses that the above affidavit concerns identical merchandise produced by the same person in Japan, see 19 USC 1401a(f)(4)(A), quoted supra. Appellant argues the appellate term erred in not considering evidence as to export value of "such merchandise" instead of considering "similar merchandise" as set forth in the above statute.

Neither the trial court or the appellate court considered the distinction drawn by appellant. Appellee answers the above argument in its brief as follows:

Much of Appellant's brief is irrelevant to this appeal. The discussion about appraisement procedures under the earlier and current statutes * * * is not pertinent because the Customs Court made no findings at all based on "similar" merchandise. There is, then, no point in asserting that sales of "such" merchandise are preferred.

Appellee's reference to "earlier and current" statutes stems from appellant's observation that prior to the enactment of 19 USC 1401a, it was well settled that until it was shown that "such" merchandise did not meet the particular statutory valuation requirements, the imported goods could not be valued by reference to "similar" merchandise, citing *United States* v. *Meadows Wye & Co.*, 15 Ct. Cust. App. 451, T.D. 42643.

It is clear from the opinions below that neither of the lower courts distinguish the evidence as applying to the "such" or "similar" goods. It is not clear from the record that this argument was made below. However, we find it unnecessary to pass on it. Whether the appellate term erred in allegedly considering evidence as to "similar" goods or not (distinguishing between "such" and "similar") depends on the sufficiency and weight of the appellant's evidence as to the "such"

goods.    Appellee challenges the weight to be accorded that evidence as follows:

The Government's case consisted of a report (Exhibit B) containing an affidavit from the president of Teiko Trading Company, seller of the binoculars in question.    The affidavit states that the prices at which the sale in question was made were as follows:

6 x 30 ZCF_____ $8. 35
8 x 30 ZCF_____  8. 80

These were check prices.    A subsequent affidavit (Exhibit C) affirmed that no rebate was paid on the sale.    The affidavit is inconsistent with the commercial invoice which shows a sales price as follows:

6 x 30 ZCF_____ $7. 20
8 x 30 ZCF_____  8. 30

The affidavit was obtained after the case was started.    Whether the affiant, a Japanese national, misunderstood its English text, made an erroneous statement or was influenced to make the statement that he did is a matter of conjecture.    The fact is, however, that the commercial invoice, made in the normal course of business, reflects purchase prices that were consistent with the market at the time and inconsistent with the affidavit.    More important, the prices shown on the invoice were presumably known to both the Government Agent and the affiant when his later statement was made.    In submitting the affidavit the Government is chargeable with knowledge that the statements therein were inconsistent with those in the invoice.    No effort was made to show that the prices on the invoice were false, erroneous or that the invoice was other than what it purported to be—a commercial record of a sale in the ordinary course of trade tendered to the Government on entry as true (19 U.S.C. 1485) and not challenged.    The inference is plain that the Government did not explain the prices on the invoices because it could not do so.

The affidavit, written in the English language and executed by a Japanese national, could easily have been misunderstood, and this would explain the inconsistency.    The inference that the affidavit was not well understood is heightened by the fact that it states that affiant *received* no rebate from the purchaser.    This error was corrected by Exhibit C, but the fact that it was made gives rise to a suggestion of carelessness, misunderstanding or some other cause of inaccuracy.    In any event, it impairs the evidentiary value of the exhibit.

*          *          *          *          *          *          *

Appellant professes to be at a loss to understand how the court below could find no evidence of value at MITI prices when the merchandise at bar was sold at such prices * * * If there were such evidence, it would not prove market value.    It would show one sale *above* market value.    But, as noted above, the best evidence of the sale, the invoice, denies that this merchandise was sold at MITI prices and Appellant does not explain the invoice at all.

Appellant's brief argues * * * in substance, that the lower court erred in considering any evidence relating to sales of similar merchandise at lower prices.    For this position the brief cites no authority.    It was the undisputed evidence that all sales of similar merchandise were at lower than MITI prices that caused the court to conclude that MITI prices did not reflect market value.    This, of course, was a very logical conclusion and it left the appraisement with no evidentiary support.

On the facts of record, we favor appellee's argument. The issue is new to the record, we do not have the benefit of any comments of the courts below, and there is a serious challenge to the weight that may be accorded the evidence offered in support of it. Most importantly, appellant does not reply to the challenge raised. We therefore find that the appellate court did not err in its consideration of the evidence directed to the appraised export value. The effect, if any, of the amendments to the above statute as to previous law need not be considered.

The appellate court in its decision commented on the evidence in relation to the appraised values as follows:

The appraiser adopted the so-called minimum prices established by MITI as the statutory export value of the subject merchandise. We are of the opinion that the appraisement was erroneous. The evidence does not support a finding that the MITI minimum prices fairly represented the export value of the imported merchandise within the purview of section 402(b) of the Tariff Act of 1930, as amended, supra, nor that the MITI prices ever inured to the exporter.

The consistent and continued method of doing business shown by the record leaves little room for doubt that the trade practice and procedure for a reasonable time, at and prior to the exportation of the merchandise undergoing appraisement, were "normal" in the trade under consideration.

The court below summed up Ochshorn's testimony in a most favorable light, as follows:

The witness testified that the method of payment and the procedure followed in obtaining the merchandise covered by the agreement, exhibit 2, supra, are representative of the practice followed by him over a period of 5 years, that throughout the period market prices were stable, and that offers of sale for binoculars, like those in question, were received from a number of other firms, which included the Oriental Trading Co., Orient Trading, Central Housewares and Eiko Kokei, all of whom are located in Tokyo.

Ochshorn, Fisher, Zimmerman, and Sulzbach, each of whom was well informed and experienced in the Japanese market, had made substantial purchases of binoculars, such as or similar to those in controversy, and were familiar with their prices. Each of these witnesses had received offers and had purchased binoculars in Japan during the first part of 1958.

We agree with the comments and conclusions above and, as they are supported by substantial evidence, we affirm the appellate term's determination in this respect.

There remains a final argument advanced by the appellant concerning the "dual burden" imposed on the importer. As noted earlier, the appellate court remanded the cause to the trial court for further proceedings to establish the proper export value according to statute. Appellant argues as follows:

* * * the lower court erred, even assuming arguendo that it was correct on the other points, in failing to enter judgment affirming the appraised values upon appellee's failure to establish its claimed values.

Referring to the stipulations of counsel in the trial court, quoted supra, it is seen that appellant then agreed that "the values claimed by appellant are based on export value." The appellate court stated in its opinion,

\* \* \* However, as stated in the brief of appellee and as reflected in the record before us, the evidence shows offers or purchases of binoculars of the three sizes in controversy, as follows:

6 × 30 ZCF_____ $7.10, $7.01, $7.30, $7.00
8 × 30 ZCF_____ $8.10, $8.02, $8.20, $8.00
7 × 35 ZCF_____ $8.10, $8.80, $8.23, $8.12, $8.20, $8.00

It is our opinion that appellant has failed to establish a uniform single price at which the subject merchandise is sold for export. *M. V. Jenkins et al.* v. *United States*, 34 CCPA 33, C.A.D. 341, and cases therein cited.

It is also clear that the so-called MITI or check price is an artificial figure which serves primarily and essentially as a control feature, rather than as a representative export value, there being no evidence of sales at the MITI or check prices.

We are further of the opinion that export value has not been shown to exist, notwithstanding the fact that counsel have stipulated to the contrary. We are not bound by such an agreement to the extent that it invades a legal conclusion.

The appellate court's treatment of this matter is eminently sound. Appellant's argument, in effect, seeks to avoid its previous stipulation and challenges the appellate term's determination to remand for additional evidence. The appellate term fully realized that appellee had not proven export value and a remand was within its discretion. On the facts of this case we find no error in this use of that discretion. The rule of "dual burden" cannot be applied here in the manner urged by appellant.

For the above reasons, the decision of the appellate term is *affirmed*.